Walter A. WINSHALL, in his capacity as the Stockholders' Representative, Plaintiff,

v.

VIACOM INTERNATIONAL, INC., a Delaware Corporation, and Harmonix Music Systems, Inc., a Delaware Corporation, Defendants.

Civil Action No. 6074–CS.

Court of Chancery of Delaware.

Submitted: Aug. 18, 2011.
Decided: Nov. 10, 2011.

Gregory V. Varallo, Esquire, Scott W. Perkins, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; David M. Schiffman, Esquire, Linton J. Childs, Esquire, Jennifer Peltz, Esquire, Sidley Austin LLP, Chicago, Illinois, Attorneys for Plaintiff.

Stephen P. Lamb, Esquire, Joseph L. Christensen, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware; Leslie G. Fagen, Esquire, Daniel J. Leffell, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Attorneys for Defendants.

## OPINION

STRINE, Chancellor.

### I. *Introduction*

This is a dispute over earn-out payments. In 2006, defendant Viacom International, Inc., a media conglomerate whose portfolio includes such brands as MTV and Nickelodeon, acquired defendant Harmonix Music Systems, Inc., a company best known for creating the music-oriented video games *Rock Band* and *Guitar Hero* (the "Merger"). Under a merger agreement entered into by Viacom, Harmonix and the selling stockholders of Harmonix (the "Selling Stockholders"), including the plaintiff, Walter A. Winshall, as the representative of the Selling Stockholders (the "Merger Agreement"), Viacom promised the Selling Stockholders an up-front payment of $175 million for their shares, as well as the contingent right to receive uncapped earn-out payments based on Harmonix's financial performance in the two years following the Merger, 2007 and 2008.

About one year after the Merger closed, Harmonix released a new video game, *Rock Band,* which was an immediate success. Harmonix had already entered into an agreement with Electronic Arts, Inc. ("EA") for the distribution of *Rock Band* through March 2010, but the game's popularity caused EA to want to renegotiate the contract in order to gain a broader scope of rights to *Rock Band* and its sequels. Because of EA's interest in amending the distribution agreement, Harmonix and Viacom allegedly had an opportunity to negotiate for an immediate reduction in distribution fees that would have potentially increased the Selling Stockholders' earn-out payments for 2008. But, at the direction of Viacom, Harmonix did not amend its contract with EA so as to immediately reduce its distribution fees. Rath-

er, Harmonix and EA's amended agreement involved a reduction in distribution fees in upcoming years, after the expiration of the earn-out period. The revised contract granted EA a number of important new rights having nothing to do with EA's already firm right to distribute *Rock Band* during 2008. These new rights included a clarification of EA's distribution rights to *Rock Band* sequels, an expansion of EA's distribution rights to cover *Rock Band* products made for handheld gaming devices, and an obligation on the part of Harmonix to release *The Beatles: Rock Band* or a comparable product during the term of the distribution agreement with EA.

Winshall sued Viacom and Harmonix on behalf of the Selling Stockholders, alleging that Viacom and Harmonix purposefully renegotiated the distribution contract with EA so as to reduce the earn-out payments payable to the Harmonix stockholders, and thus breached the covenant of good faith and fair dealing implied in the Merger Agreement. I dismiss Winshall's claim.

Winshall would have me imply a duty on the part of Viacom and Harmonix to take any opportunity during the earn-out period to increase the earn-out payment for 2008, regardless of whether that opportunity was offered to Viacom and Harmonix in exchange for granting the counterparty rights to future assets in which the recipients of the earn-outs had no reasonable

expectancy interest. Even assuming that Viacom and Harmonix intentionally forewent a possible opportunity to increase Harmonix's profits during the earn-out period, and structured the amended contract with EA so that Viacom and Harmonix could enjoy all of the benefits for themselves, Viacom and Harmonix took no steps to reduce any reasonable contractual expectation of the Selling Stockholders. It would be inequitable for this court to imply a duty on Viacom and Harmonix's part to share with the Selling Stockholders the benefits of a renegotiated contract addressing EA's right to distribute Harmonix products after the expiration of the earn-out period. The implied covenant of good faith and fair dealing is not a license for a court to make stuff up, which is what Winshall seeks to have me do.

## II. *Factual Background*

The following facts are drawn exclusively from Winshall's amended complaint (the "Amended Complaint"), the exhibits attached thereto, and the documents that it incorporates.[1]

### A. *Viacom Acquires Harmonix*

On September 20, 2006, after the release and success of Harmonix's video game *Guitar Hero*, Viacom, Harmonix, the Selling Stockholders, and Winshall entered into the Merger Agreement.[2] As a result

---

1. In certain circumstances, this court may consider the plain terms of documents incorporated in the complaint without converting a motion to dismiss into one for summary judgment. *See, e.g., Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,* 691 A.2d 609, 613 (Del.1996) (explaining that there is an exception to the general Rule 12(b)(6) prohibition against considering documents outside of the pleadings when the documents are "integral" to a plaintiff's claim and incorporated into the complaint); *Hillman v. Hillman,* 910 A.2d 262, 269 (Del.Ch.

2006) (considering the plain terms of written agreements that were integral to the complaint in determining a motion to dismiss, among other things, a claim for breach of contract).

2. The Merger Agreement designates Winshall as the "Stockholders' Representative." Am. Compl. Ex. A (Agreement and Plan of Merger (September 20, 2006)) § 10.8(d). In that capacity, he is the attorney-in-fact for the Selling Stockholders, and has the authority to enforce their rights under the Merger Agreement.

of the Merger, which closed on October 27, 2006, Harmonix became a wholly-owned subsidiary of Viacom. The Selling Stockholders relinquished their shares in exchange for two forms of consideration. First, they were paid $175 million in cash, due at closing. Second, they received the contingent right to be paid cash earn-outs for the years 2007 and 2008 based on the extent to which Harmonix's "Gross Profit" exceeded certain targets.[3]

Under the Merger Agreement, Gross Profit is defined as the sum of "Product Gross Profit" for all of Harmonix's products, Product Gross Profit being the difference between (i) the "Net Revenue" attributable to the product and (ii) the sum of all "Direct Variable Costs" attributable to the product.[4] Direct Variable Costs consist of, among other things, "distribution fees" and "royalties payable to third parties."[5] As a result of the Merger, the Selling Stockholders became entitled to receive cash payments equal to three and a half times the excess, if any, over Gross Profit thresholds of $32 million in 2007 and $45 million in 2008. The amount of the earn-out payments was not subject to a cap or ceiling.

In other words, the Selling Stockholders were entitled under the Merger Agreement to potentially unlimited cash payments based on the cumulative financial performance of all Harmonix products in the two years following the company's acquisition by Viacom. Notably, the Merger Agreement does not contain any provision governing the operation of Harmonix during the earn-out period, nor does it contain any efforts clause related to the earn-out payments. The Merger Agreement further provides that both Winshall (as the Selling Stockholders' representative) and Viacom are entitled to submit any disputes relating to the amounts of the 2007 and 2008 earn-out payments to a "Resolution Accountant," whose determination will be binding on the parties.[6]

### B. Harmonix Enters Into A Distribution Agreement With EA

On March 6, 2007, Harmonix entered into an agreement with EA for the distribution of a new project, the video game *Rock Band* (the "Original EA Agreement"). Under the Original EA Agreement, which had a term of three years and was set to expire on March 6, 2010,[7] Harmonix agreed to pay sales and other fees to EA for the distribution of Rock Band. Winshall alleges that these fees were "one of the largest single expenses incurred by Harmonix."[8] The Original EA Agreement provided that, if EA met a specified "sequel threshold" by earning a certain amount of revenues by the six-month anniversary of *Rock Band's* launch, it would receive the right to distribute sequels to *Rock Band.*[9] If EA did not meet the sequel threshold requirement by the time Harmonix began work on a sequel, it would receive a right of "first negotiation" to such sequel.[10] The Original EA Agreement defines a "Sequel" as a game that has "con-

---

3. *Id.* § 2.1(c)(ii)(A)-(B).

4. *Id.* §§ 2.1(c)(ii)(I), 2.1(c)(ii)(N).

5. *Id.* § 2.1(c)(ii)(E).

6. *Id.* § 2.4(c).

7. EA and Harmonix further agreed that the Original EA Agreement would "automatically renew for additional one-year periods" unless either party gave the other advance notice of termination. Christensen Aff. Ex. 1 (Licensing Agreement (March 6, 2007)) § 37(a).

8. Am. Compl. ¶ 34.

9. Christensen Aff. Ex. 1 (Licensing Agreement (March 6, 2007)) §§ 15(d), 15(e)(i).

10. *Id.* § 15(e)(ii).

tent and branding such that the ordinary user would regard it as a sequel version" of *Rock Band.*[11] It is clear on the face of the Original EA Agreement that *Rock Band 2* would be a Sequel, but not entirely clear that a derivative game involving a specific band, such as *The Beatles: Rock Band,* would be.[12] Furthermore, a *Rock Band* game made for a platform not contemplated by the Original EA Agreement would not be a Sequel to which EA had distribution rights.[13] Importantly, Harmonix was not obligated under the Original EA Agreement to "propose or create a Sequel."[14]

When the Original EA Agreement was negotiated, *Rock Band* was still in development, and Winshall alleges that the Original EA Agreement reflected the uncertainty of *Rock Band's* market potential "by setting a relatively high distribution fee but giving Harmonix the right to renegotiate."[15] But, the Amended Complaint does not allege that the Original EA Agreement contained a renegotiation provision, and there is in fact no provision in the Original EA Agreement that gives Harmonix the right to renegotiate with EA based on *Rock Band's* performance in the market. The "right to renegotiate" referred to by Winshall is thus simply a right any party has to ask a counterparty to consider amending a deal.

### C. The Success Of Rock Band Gives Harmonix Leverage Over EA

When *Rock Band* was launched on November 20, 2007, it was a huge hit. Ac-cording to Winshall, "[a]fter only 15 months on the market, *Rock Band* surpassed $1 billion in retail game sales in North America."[16] *Rock Band's* immediate success following its launch made it possible for Viacom and Harmonix to renegotiate the terms of the Original EA Agreement in 2008. Winshall alleges that "EA offered Harmonix a reduction in 2008 distribution fees in order to retain the worldwide distribution rights to *Rock Band* and its sequels."[17] The Amended Complaint does not allege exactly when renegotiations began or when EA offered this reduction in fees, but the Original EA Agreement was not amended until October 2008, a mere two months before the end of the final earn-out year. Instead of taking EA up on its offer of a 2008 fee reduction, Viacom and Harmonix agreed to amend the Original EA Agreement so as to allow EA to continue distributing *Rock Band* in 2008 for the same fees, while procuring reduced fees in the future as well as certain other benefits that had no effect on the Selling Stockholders' potential earn-out payment for 2008.

### D. What Did Viacom, Harmonix And EA Gain From Renegotiation?

It is worth pausing over the important differences between the Original EA Agreement and the agreement as amended (the "Amended EA Agreement"), because they are material to an analysis of Wins-

---

11. *Id.* § 15(c).

12. The Original EA Agreement specifies that "a video game with substantially the same title as [*Rock Band*] with an added 'II' or '2' and with similar game play for one or more of the Authorized Platforms would be a Sequel." *Id.*

13. *Id.* ("For clarity, only a video game for an Authorized Platform (*i.e.*, Sony PlayStation 3,

Microsoft Xbox 360 or Nintendo Wii) may be a Sequel under this Agreement.").

14. *Id.*

15. Pl. Br. at 3.

16. Am. Compl. ¶ 17.

17. Am. Compl. ¶ 37.

hall's claim.[18]

The Amended EA Agreement broadened and clarified the scope of *Rock Band* products to which EA had distribution rights. EA shored up its rights to *Rock Band 2* (which was released in 2008) and a "Project 9" (which was under development by Harmonix at the time).[19] Project 9 was *The Beatles: Rock Band.* Under the Amended EA Agreement, unlike under the Original EA Agreement, Harmonix was obligated to develop *The Beatles: Rock Band* or a comparable product before the distribution agreement expired. The Amended EA Agreement provided that, if *The Beatles: Rock Band* was not released during the term of the agreement (which was extended to March 31, 2010), the term would extend to the last day of the quarter during which the game was released, with a drop dead date of December 31, 2010. EA and Harmonix also agreed that EA would have distribution rights to versions of *Rock Band* made for handheld gaming devices (specifically, Sony PSP and Nintendo DS versions), which was another right for which the Original EA Agreement had not specifically provided.

In exchange for this expansion of its distribution rights, EA agreed that distribution fees would stay the same for *Rock Band* and *Rock Band 2*, but would be reduced for *The Beatles: Rock Band* or any substitute project in the event that Harmonix could not get the necessary rights from The Beatles. EA also made a firm commitment to purchase millions of dollars of advertising from certain Viacom media outlets, and agreed to pay "[r]oyalties for forecasted shipments in November and December 2008 . . . as an advance no later than December 30, 2008."[20] These payments were not otherwise due until later periods. The benefits conferred on Harmonix and Viacom by the Amended EA Agreement had no effect, positive or negative, on the amount of the 2008 earn-out payment over what was expected under the Original EA Agreement. In other words, these new benefits did not affect the inputs to the earn-out payment calculus set forth in the Merger Agreement.

### E. *Winshall Sues Viacom And Harmonix*

On March 28, 2011, Winshall filed the Amended Complaint in this court on behalf of the Selling Stockholders. The Amended Complaint contains three counts, but I need only address Count I for purposes of this opinion. In Count I, Winshall asserts that Viacom and Harmonix breached their *implied covenant of good faith and fair dealing* under the Merger Agreement by renegotiating the Original EA Agreement with the intent to defer, until after the earn-out period, a reduction in fees that was justified by the high volume of *Rock Band* sales in late 2007 and early 2008, thereby "manipulating and reducing" the amount of the 2008 earn-out payment due to the Selling Stockholders.[21] In other words, Winshall contends that, given the opportunity to renegotiate the EA Agreement, Viacom and Harmonix were obligated to use that opportunity to lower the distribution fees paid to EA in 2008 and, thus, increase the 2008 earn-out payment to the Selling Stockholders.

---

**18.** The amendments made to the Original EA Agreement are evidenced in a term sheet, dated October 10, 2008, that was submitted by Viacom and Harmonix.

**19.** Christensen Aff. Ex. 1 (Term Sheet: Amendment to the Licensing Agreement by and between Harmonix and EA (October 10, 2008)) at 1.

**20.** *Id.* at 4.

**21.** Am. Compl. ¶ 48.

### III. *Procedural Framework*

Viacom and Harmonix have moved to dismiss Count I of Winshall's complaint for failure to state a claim upon which relief can be granted.[22]

As recently reaffirmed by the Delaware Supreme Court, the pleading standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) are minimal.[23]

---

**22.** In the alternative to their motion to dismiss, Viacom and Harmonix have moved under Court of Chancery Rule 26(c) to stay this action pending the determination of certain disputes over the amounts of the earn-out payments for 2007 and 2008 by the Resolution Accountant in accordance with the terms of the Merger Agreement. Because I resolve the motion to dismiss in Viacom and Harmonix's favor, there is no need to address their motion to stay.

**23.** *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011). In *Central Mortgage*, the Supreme Court seems to have had been persuaded by an advocate that the Court of Chancery had altered Delaware's approach to the Rule 12(b)(6) pleading standard to conform to recent federal case law, notably *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). *See Cent. Mortg. Co.*, 27 A.3d at 537 (perceiving that the Court of Chancery had moved to adopt recent federal decisional law such as *Twombly* and *Iqbal*). This appears to have in part inspired the Supreme Court to articulate an approach to dismissal motions that builds on the most liberal federal approach. *See id.* That very relaxed standard is the one articulated under *Conley v. Gibson*, stating that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In fact, our Supreme Court has now suggested that "vague allegations" that could "conceivably" conjure up a state of affairs that, while not supported by pled facts, might support a cause of action, are sufficient to state a claim upon which relief may be granted. *Cent. Mortg. Co.*, 27 A.3d at 536–37. By this means, *Central Mortgage* seems to have been intended to keep Delaware true to itself and immune from federal influence. *See id.* at 537 ("[W]e emphasize that, until this Court decides otherwise or a change is duly effected through the Civil Rules process, the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.' ").

What is to me regrettable if this is the case is that to the extent *Twombly* and other federal cases were originally cited by this court, it was to emphasize that our Supreme Court— i.e., the Delaware Supreme Court—had long put more rigor in Rule 12(b)(6) than its federal counterpart, the United States Supreme Court. For years, this court had understood our Supreme Court to require a plaintiff to plead non-conclusory facts that supported a cause of action. *See, e.g., Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) ("We decline … to accept conclusory allegations unsupported by specific facts…."); *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del.2010) ("We do not … blindly accept conclusory allegations unsupported by specific facts…."); *Gantler v. Stephens*, 965 A.2d 695, 704 (Del.2009) (same); *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del.2008) (stating that "conclusory allegations need not be treated as true"); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del.2006) ("A trial court is not … required to accept as true conclusory allegations without specific supporting factual allegations.") (internal citation omitted); *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del.1996) ("[C]onclusions … will not be accepted as true without specific allegations of fact to support them.") (citing *In re Tri–Star Pictures, Inc., Litig.*, 634 A.2d 319, 326 (Del.1993)). That, of course, did not mean that a plaintiff had to meet a particularized pleading standard when pleading a cause of action under Rule 12(b)(6). *See Malpiede v. Townson*, 780 A.2d 1075, 1082–83 (Del.2001) (contrasting the particularized pleading standard under Court of Chancery Rule 23.1 with the more lenient standard under Rule 12(b)(6)); *Solomon*, 672 A.2d at 39 (Del.1996) (same). But it did mean that conclusory allegations were insufficient and that the pleading of factual allegations making out a cause of action was required. Hence, when this court cited to *Twombly* in the case of *Desimone v. Barrows*, it was only to note that the federal courts seemed to be moving to a pleading standard

When considering Winshall's motion to dismiss, I must accept all well-pleaded factual allegations in the Amended Complaint as true, accept even vague allegations in the Amended Complaint as "well-pleaded" if they give the defendants notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any "reasonably conceivable" set of circumstances susceptible of proof.[24] I find that Winshall fails to meet even this minimal pleading burden.

## IV. *Legal Analysis*

 Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract.[25] The implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[26] A party is liable for breaching the covenant when its conduct "frustrates the overarching purpose of the contract by taking advantage of [its] position to control implementation of the agreement's terms."[27]

 The court must be mindful that the implied covenant of good faith and fair dealing should not be applied to give plain-

---

more consistent with Delaware's approach. *See Desimone v. Barrows*, 924 A.2d 908, 928 (Del.Ch.2007). That, critically, was the causal direction, not the reverse one that seems to have been suggested by a party in *Central Mortgage*. Furthermore, by using the phrase "plausible," this court had no intention to engage in the fine linguistic slicing games enjoyed by its federal counterparts. To this mind, if something is conceivable, it is plausible. If something is implausible, it is inconceivable. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 469, 1736 (G. & C. Merriam Company 1976) (defining "conceivable" to mean "capable of being conceived, imagined, or understood," or "logically possible," and defining "plausible" to mean "superficially worth of belief: credible"); *see also* ROGET'S DESK THESAURUS 405 (Random House, Inc.1995) (identifying "conceivable" as a synonym of "plausible"). In the hands of Marc Vetri, Daniel Boulud or Mario Batali, thin slicing of this kind results in delightful salumi or charcuterie. For the purposes of helping to formulate a workable pleading standard, I confess to finding such minute cutting to have more false precision than utility.

Given the substantial costs of discovery, the burdens to the judicial system, and the drag on economic efficiency that come with excessive litigation, there was substantial benefit to Delaware's long-standing approach to Rule 12(b)(6), which provided a fair and efficient approach to determining which complaints passed go. One of the strengths of our common law case-by-case approach is that indi-

vidual cases that seem to be a departure can, with the context provided by later cases, be seen to have had a more case-specific meaning and less systemic effect. I am chary, therefore, about reading *Central Mortgage* as a marked departure from Delaware's long-standing tradition of requiring that a plaintiff plead sufficient non-conclusory facts to support a pleading stage inference that a cause of action exists.

24. *Cent. Mortg.*, 27 A.3d at 536.

25. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (internal citation omitted); *see also Katz v. Oak Indus.*, 508 A.2d 873, 880 (Del.Ch.1986) ("Modern contract law has generally recognized an implied covenant to the effect that each party to a contract will act in good faith towards the other with respect to the subject matter of the contract."); *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del.Ch. Nov. 10, 1998) ("All contracts are subject to an implied covenant of good faith and fair dealing."); 23 WILLISTON ON CONTRACTS § 63:22 (4th ed. 2000) ("Every contract imposes an obligation of good faith and fair dealing between the parties in its performance and its enforcement, and if the promise of the defendant is not expressed by its terms in the contract, it will be implied.").

26. *Dunlap*, 878 A.2d at 442 (internal citation omitted).

27. *Id.*

tiffs contractual protections that "they failed to secure for themselves at the bargaining table." [28] In other words, the implied covenant is not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal.[29] Rather, a party may only invoke the protections of the covenant when it is clear from the underlying contract that "the contracting parties would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter." [30]

Winshall argues that, because Viacom and Harmonix had the market power to renegotiate the Original EA Agreement, and because an opportunity presented itself whereby the amount of the 2008 earn-out payment could be increased, Viacom and Harmonix had an implied obligation under the Merger Agreement to take that opportunity. I find that Winshall has failed to allege facts that support a reasonable inference that the Selling Stockholders did not get the benefit of their bargain under the Merger Agreement. On these facts, even viewed in the light most favorable to Winshall, the Selling Stockholders could not conceivably have had a reasonable expectation that Viacom and Harmonix had a duty to renegotiate the Original EA Agreement to increase the amount of earn-out payments the Selling Stockholders would receive.

**A. Winshall Has Not Alleged Facts To Support A Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing**

 Keeping in mind the standard of review that I must apply at the motion to dismiss stage, I assume for purposes of this decision that, when faced with a chance to renegotiate the EA Agreement so as to either maximize the earn-out payments owed to the Selling Stockholders or so as to confer a benefit on themselves, Viacom and Harmonix chose the latter course. I also assume that, although the Original EA Agreement was not amended until October 2008, EA offered either a reduction in distribution fees for the remainder of 2008, or a retroactive reduction in distribution fees that would have covered all or part of 2008. Winshall does not plead that the fee reduction offered by EA would have had any effect on the 2007 earn-out payment. Essentially, there was a contractual surplus available to be had because of the opportunity presented by EA's desire to enter into a broader, more thorough agreement with Harmonix. The dispute here boils down to whether Viacom and Harmonix's decision to take this surplus for themselves rather than use some of it to increase the potential payments to be made to the Selling Stockholders constituted a breach of the implied duty of good faith and fair dealing under the Merger Agreement.

28. *Aspen Advisors LLC v. United Artists Theatre Co.,* 861 A.2d 1251, 1260 (Del.2004).

29. *See Allied Capital Corp. v. GC–Sun Holdings, L.P.,* 910 A.2d 1020, 1032–33 (Del.Ch. 2006) ("[I]mplied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand, and only when the court finds that the expectations of the parties were so fundamental that it is clear that they did not feel a need to negotiate about them."); *see also Nemec v. Shrader,* 991

A.2d 1120, 1126 (Del.2010) (holding that, when conducting an analysis of whether a party breached the implied covenant of good faith and fair dealing, the court "must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal.").

30. *Dunlap,* 878 A.2d at 442 (citing *Katz,* 508 A.2d at 880).

I find that Winshall's already tenuous argument buckles in light of two factors: (i) although Viacom and Harmonix did not accept a reduction in 2008 distribution fees, neither did they take action to *increase* the 2008 fees beyond what was expected under the Original EA Agreement; and (ii) it is not conceivable that the benefits conferred on Viacom and Harmonix by the renegotiation were offered in exchange for product sales in which the Selling Stockholders had a valid expectancy interest—*i.e.*, sales during 2008.

### 1. *Viacom And Harmonix Did Not Impair The Selling Stockholders' Rights Under The Merger Agreement*

It is undisputed that, under the Merger Agreement, Viacom was obligated to pay earn-out payments to the Selling Stockholders if Harmonix's financial performance exceeded certain targets. The distribution fees payable to EA under the Original EA Agreement factored into the earn-out payment calculus because they made up part of the "Direct Variable Costs" as defined in the Merger Agreement. But, Winshall does not allege that Viacom or Harmonix took any actions to undermine Harmonix's capacity to generate profit below the level reasonably expected by the parties at the time that they entered into the Merger Agreement. Rather, he argues that Viacom and Harmonix breached the implied covenant of good faith and fair dealing by failing to take an opportunity that would have increased the 2008 earn-out payment.

To my mind, there is a critical difference between Viacom and Harmonix's actions here and the actions of an acquiror who promises earn-out payments to the sellers of the target business and then purposefully pushes revenues out of the earn-out period. It is true that when a contract confers discretion on one party, the implied covenant of good faith and fair dealing requires that the discretion—such as Viacom's discretion in controlling Harmonix after the Merger and during the earn-out period—be used reasonably and in good faith.[31] Thus, for example, if Viacom and Harmonix had agreed to pay double EA's ask in distribution fees in 2008 in return for paying no distribution fees in 2009, such an agreement would arguably be a breach of the implied covenant. In that case, Viacom and Harmonix would be depriving the Selling Stockholders of their reasonable expectations under the Merger Agreement by actively shifting costs into the earn-out period that had no place there. But, "[a] party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party."[32] Winshall would have me hold that the discretion over the Harmonix business afforded to Viacom when it acquired Harmonix from the Selling Stockholders was subject to an implied covenant of good faith that encompassed not only a duty not to harm the Harmonix business so as to reduce Gross Profit for purposes of calculating the earn-outs, but also to do everything it could to increase the earn-out payments. As Viacom and Harmonix point out, "on [Winshall's] logic, Defendants would have been obligated to negotiate the distribution fees down to zero for 2008 to maximize the impact on the [earn out payment for 2008] and make up the shortfall with higher payments thereafter—a commercially absurd outcome."[33] This is not a tenable application of the limited implied covenant of good faith and fair dealing.

**31.** *See Airborne Health, Inc. v. Squid Soap, LP,* 984 A.2d 126, 146–47 (Del.Ch.2009).

**32.** *Nemec,* 991 A.2d at 1128.

**33.** Def. Reply. Br. at 10.

Winshall's argument is rendered even more inconceivable in light of the fact that the Merger Agreement provided for *unlimited* earn-out payments to the Selling Stockholders to the extent that Harmonix's financial performance exceeded certain thresholds. Using the implied covenant of good faith and fair dealing to imply an obligation to maximize those already uncapped payments is simply not in line with the reasonable expectations of the parties. To my mind, no reasonable commercial actor in Viacom's position at the time of the acquisition would agree not only to pay earn-outs subject to no cap or ceiling, but also to be duty-bound to accept any opportunities that would have the effect of increasing those earn-out payments during the relevant period. Certainly, the Merger Agreement sets forth no such duty. Winshall's claim here is an attempt to rewrite the terms of the Merger by having me imply such a duty into the interstices of the 79–page, *single-spaced* Merger Agreement. This is exactly the kind of rank contractual revisionism that courts must avoid when addressing implied covenant claims.[34]

Because the facts do not support an inference that Viacom and Harmonix acted to deprive the Selling Stockholders of their reasonably expected benefits under the Merger Agreement, this case is readily distinguishable from *Keating v. Applus+ Technologies, Inc.,*[35] a case that Winshall describes as "closely analogous"

to the present one.[36] In *Keating,* the stockholders of Keating Technologies sold their company to Applus. Under the stock purchase agreement entered into by the parties, these selling stockholders were entitled to earn-out payments based on revenues earned by Keating Technologies under any new contracts signed *during the six years* after the sale.[37] Shortly after the earn-out period expired, the company entered into a major contract.[38] The selling stockholders sued, alleging that Applus "deliberately delayed" entering into the contract so that it could avoid its earn-out obligations under the stock purchase agreement.[39] The court held that the complaint stated a claim for breach of the implied covenant of good faith and fair dealing, stating that "Applus cannot avoid its contractual obligations by creating, in bad faith, an outcome that technically satisfies the express terms of the [stock purchase agreement], but deprives plaintiffs of their legitimate expectations."[40]

Here, by contrast, the Selling Stockholders had no legitimate expectation that, if Harmonix was offered a chance to renegotiate the amount of distribution fees payable under a distribution agreement that was entered into *after* the Merger, the terms of which are *not* challenged as unfair, it would choose a structure that benefited the Selling Stockholders and increased the amount of already unlimited earn-out payments that it was obligated to make under the Merger Agreement.

---

**34.** *See Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del.1998) ("In cases where obligations can be understood from the text of a written agreement but have nevertheless been omitted in the literal sense, a court's inquiry should focus on what the parties likely would have done if they had considered the issue involved.") (internal citation omitted).

**35.** 2009 WL 261091 (E.D.Pa. Feb. 4, 2009) (applying Delaware law).

**36.** Pl. Br. at 17.

**37.** *Keating,* 2009 WL 261091, at *1.

**38.** *Id.*

**39.** *Id.*

**40.** *Id.* at *4.

*Keating* would be analogous to the present case if Viacom and Harmonix had, for example, deliberately delayed the release of *Rock Band* or *Rock Band 2* until after the earn-out period expired. But, it is not alleged that Viacom and Harmonix intentionally pushed revenue out of the earn-out period, or that they purposely shifted costs into the earn-out period in exchange for reduced costs in some future period.

### 2. The Amended EA Agreement Conferred Broader Rights In The Future

Winshall's claim is not only inconceivable, its acceptance would be unfair. Why? Because under the facts pled in the complaint and the documents that it incorporates, it is clear that Winshall seeks to have the Selling Stockholders receive increased earn-out payments based on assets—products to be sold after 2008 that EA wished to distribute—in which the Selling Stockholders had no contractual expectancy. Winshall claims that "the huge and immediate success of *Rock Band* ... gave [Viacom and Harmonix] an opportunity to negotiate for a reduction of the distribution fees in 2008 if EA wanted to retain the distribution rights to *Rock Band* and its sequels."[41] But, under the plain terms of the Original EA Agreement, EA had distribution rights to *Rock Band* products until March 2010. It is undisputed that EA had rights to the *Rock Band* products that entered the market during the earn-out period—*Rock Band* and its sequel *Rock Band 2*. As Viacom and Harmonix acknowledged at oral argument,

these were the games in which the Selling Stockholders clearly had an expectancy interest.[42] But that interest only extended to the sales of these games in 2007 and 2008, not to sales made in later periods.

The question then becomes, why did EA want to renegotiate its agreement with Harmonix in 2008, when it already had the distribution rights to *Rock Band* and *Rock Band 2* until 2010? Given the absence of a renegotiation provision in the Original EA Agreement based on *Rock Band's* performance, Winshall's allegation makes sense only if I assume that EA was offering a reduction in 2008 distribution fees in return for new benefits. Even Winshall does not suggest, and it would be unreasonable to assume, that EA wanted to renegotiate because it charitably decided that it was too much in the plush with the distribution fees payable by Harmonix under the Original EA Agreement. It was just embarrassed to be doing so well! Not "reasonably conceivable" to me.[43]

Rather, as a reasonable commercial actor, EA must have wanted some extension of its distribution rights to *Rock Band* products. Nothing in the Amended Complaint rationally supports an inference that Harmonix could have pulled the plug on the Original EA Agreement in 2008, before the end of the earn-out period. EA would not offer concessions in return for any 2008 *Rock Band* products, because it already had the contractual rights to *Rock Band* and *Rock Band 2*, which were the *Rock Band* games released during that year. I can only infer that EA was trying

41. Am. Compl. ¶ 34.

42. At oral argument, counsel for Viacom and Harmonix stated that he thought "anything that was on the market in 2008 is part of the earn-out period." *Winshall v. Viacom Int'l, Inc.*, C.A. No. 6074, at 80 (Del. Ch. Aug. 18, 2011) (TRANSCRIPT).

43. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011). In fact, I do not find it "rationally" conceivable, if a more liberal point of view is required. *Cf. Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150–51 (Del. 2002).

to button up its rights to future products in future periods—products that were released after the expiration of the earn-out period and in which the Selling Stockholders had no reasonable expectancy interest.

This is the only inference rationally supported by the Amended Complaint and the relevant contracts that it incorporates. These documents make clear that the key concession that EA got in return for amending the Original EA Agreement was a guaranteed right to *The Beatles: Rock Band*, a game that was still in development during the earn-out period. Before entering into the Amended EA Agreement, Harmonix was not required to produce *any* sequels to Rock Band. After the amendment, Harmonix had an obligation to develop and launch *The Beatles: Rock Band*—or a comparable product—during the term of its distribution agreement with EA. Given the enduring and justifiable popularity of John, Paul, George, and Ringo,[44] and the gangbuster performance of the original *Rock Band* pled in the Amended Complaint, the only fair inference to draw here is that the distribution rights to *The Beatles: Rock Band* were a coveted ticket.

It also bears noting that the Amended EA Agreement provided that EA would have the right to distribute versions of *Rock Band* made for handheld gaming devices. Again, this demonstrates an expansion of the scope of EA's rights under the Original EA Agreement. EA was bargaining with Viacom and Harmonix for broader opportunities in the future, not for the rights that it already had. Thus, Winshall's argument fails in that the Selling Stockholders had no expectancy interest in the products covered by the new agreement.

In fact, what Winshall proposes is that Viacom had a duty to apply consideration that EA was offering for products that would be on the market after 2008 and in which the Selling Stockholders therefore had no expectancy and bestow it on the Selling Stockholders. Thus, the implied covenant of good faith and fair dealing, in Winshall's view, requires that a party to an agreement not simply refrain from upsetting the fundamental expectations of the other party, as implied by the explicit terms of the deal, but actually improve that deal by expanding its contractual counterparty's expectancy as a matter of judicially compelled charity, not toward a 501(c)(3), but toward another sophisticated commercial actor. Delaware law does not imply such an extraordinary duty, which would be a fundamentally unfair judicial rewriting of a contract.

### B. *Winshall Does Not Survive The Motion To Dismiss Because Of The Missing Schedule L*

Winshall does not allege in his Amended Complaint that Harmonix had any contractual right to terminate the Original EA Agreement before it expired in March 2010, and thereby deprive EA of distribution rights to *Rock Band* and *Rock Band 2* during the earn-out period. But, at oral argument, Winshall's counsel raised for the first time the issue of a side agreement to the Original EA Agreement, as provided for in Exhibit L to the Original EA Agreement, never having been completed. He orally speculated that the absence of the agreement contemplated by Exhibit L was evidence of why EA came forward to offer inducements to renegotiate the Original EA Agreement, including a reduction in 2008 distribution fees.

The Original EA Agreement provides, in relevant part:

---

44. I mean, really, what group is better? Sorry Stones fans, but the Liverpool lads rule.

EA's rights and obligations to distribute [*Rock Band* products] ... are conditioned upon the agreement by Harmonix and EA upon a Minimum Royalty Base and Minimum Sales Deduction therefor, whether in Schedule L, or by separate written agreement of the parties. To the extent that these amounts are not set forth on Schedule L, then the Parties will use their best efforts to agree on such amounts in writing in signed amendment to this Agreement on or before May 31, 2007.[45]

Schedule L, which is attached to the Original EA Agreement, does not set forth all of these amounts. Winshall's counsel claimed at oral argument that they were never agreed upon, that no "signed amendment" was executed on or before May 31, 2007, and that Harmonix therefore had the right to terminate the Original EA Agreement at a time when, due to the success of *Rock Band*, it had enormous leverage over EA. I reject this argument.

 First, this argument was never fairly made in the Amended Complaint or in Winshall's brief in opposition to Viacom and Harmonix's motion to dismiss. There is no allegation of any insecurity on the part of EA about an undefined Minimum Royalty Base and Minimum Sales Deduction. This argument was therefore not fairly or timely presented and was waived.[46] Second, Winshall's attempt to portray Schedule L as the lynchpin to the entire Original EA Agreement strains credulity and my concept of conceivability. It is undisputed that EA began and continued to distribute *Rock Band* (which was launched well after May 31, 2007) under the Original EA Agreement without interruption and with great success for Viacom and Harmonix. I cannot plausibly infer, given what Winshall has himself pled about the success of *Rock Band,* that the failure to have a locked-in Exhibit L to the Original EA Agreement gave Viacom a clear right to terminate the contract without having any obligation to negotiate the amounts of the Minimum Royalty Base and Minimum Sales Deduction in good faith, when the Original EA Agreement plainly states that the parties will use their "best efforts" to negotiate such amounts.[47] Furthermore, the facts alleged in the Amended Complaint themselves suggest that EA initiated negotiating in 2008, that it entered a revised agreement with Harmonix securing important rights beyond 2008, and therefore that EA was offering a concession for future rights in periods *after* the earn-out expired (*i.e.,* to *The Beatles: Rock Band*), not to secure what it already had a firm right to in 2008—the right to distribute *Rock Band* and *Rock Band 2* in that year.

## V. *Conclusion*

For the foregoing reasons, Viacom and Harmonix's motion to dismiss is GRANTED. IT IS SO ORDERED.

---

**45.** Christensen Aff. Ex. 1 (Licensing Agreement (March 6, 2007)) § 27(c).

**46.** *See, e.g., Thor Merritt Square, LLC v. Bayview Malls LLC,* 2010 WL 972776, at *5 (Del. Ch. Mar. 5, 2010); *Franklin Balance Sheet Inv. Fund v. Crowley,* 2006 WL 3095952, at *4 (Del.Ch. Oct. 19, 2006); *Criden v. Steinberg,* 2000 WL 354390, at *4 (Del.Ch. Mar. 23, 2000).

**47.** Christensen Aff. Ex. 1 (Licensing Agreement (March 6, 2007)) § 27(c).