IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LAZARD TECHNOLOGY PARTNERS, LLC, as representative of the former equityholders of Cyveillance, Inc., | § § § § § | No. 464, 2014 |
| Plaintiff Below, Appellant, | § § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § | C.A. No. 6815-VCL |
| QINETIQ NORTH AMERICA OPERATIONS LLC, | § § § § | |
| Defendant Below, Appellee. | § § § | |

Submitted: April 11, 2015
Decided: April 23, 2015

Before **STRINE**, Chief Justice; **HOLLAND** and **VALIHURA**, Justices; and **GRAVES** and **WALLS**, Judges;[*] constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

Michael F. Bonkowski, Esquire, Cole, Schotz, Meisel, Forman & Leonard, P.A., Wilmington, Delaware;  Roger A. Lane, Esquire (*argued*), Courtney Worcester, Esquire, Foley & Lardner LLP, Boston, Massachusetts, for Appellant.

Srinivas M. Raju, Esquire, Robert L. Burns, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware;  Allen M. Gardner, Esquire (*argued*), Jessica E. Phillips, Esquire, Latham & Watkins LLP, Washington, DC, for Appellee.

**STRINE**, Chief Justice:

---

[*] Sitting by designation under Del. Const. art. IV, § 12.

This is an appeal in an earn-out dispute arising from a merger. The appellant represents former stockholders of Cyveillance, Inc., a cyber technology company (the "company"), whom we refer to as the "seller" for the sake of clarity. The appellee (the "buyer") paid $40 million up-front to the company and promised to pay up to another $40 million if the company's revenues reached a certain level. Section 5.4 of the merger agreement prohibited the buyer from "tak[ing] any action to divert or defer [revenue] with the intent of reducing or limiting the Earn-Out Payment."[1] When the earn-out period ended, the revenues had not reached the level required to generate an earn-out.

The seller filed suit in the Court of Chancery, arguing that the buyer breached Section 5.4 of the merger agreement. The seller also argued that the buyer violated the merger agreement's implied covenant of good faith and fair dealing by failing to take certain actions that the seller contended would have resulted in the achievement of revenue sufficient to generate an earn-out.

After a trial, extensive briefing, and post-trial oral argument, the Court of Chancery issued a bench decision reviewing the factual circumstances the seller alleged amounted to a breach of Section 5.4 of the merger agreement and the implied covenant.[2] In that decision, the Court of Chancery found that the merger agreement meant what it said, which is that in order for the buyer to breach Section 5.4, it had to have acted with the "intent of reducing or limiting the Earn-out Payment."[3] After reviewing each of the

---

[1] App. to Opening Br. at 801 (Merger Agreement § 5.4).
[2] Ex. A to Opening Br. [hereinafter "Bench Opinion"].
[3] App. to Opening Br. at 801 (Merger Agreement § 5.4).

seller's theories as to how the buyer had acted with the requisite intent, the Court of Chancery found that the seller had not proven that any business decision of the buyer was motivated by a desire to avoid an earn-out payment.[4]

Likewise, the Court of Chancery rejected the seller's implied covenant claim. The Court of Chancery held that the merger agreement was complex and required a number of actions, including actions that would occur post-closing.[5] It thus found that the merger agreement's express terms were supplemented by an implied covenant. But as to whether conduct not prohibited under the contract was precluded because it might result in a reduced or no earn-out payment, the Court of Chancery held that, consistent with the language of Section 5.4, the buyer had a duty to refrain from that conduct only if it was taken with the intent to reduce or avoid an earn-out altogether.[6]

On appeal, the seller argues that the Court of Chancery misinterpreted the merger agreement in both respects, and also that its factual conclusions warrant no deference because they were made in a succinct bench ruling. As to the first argument, the seller argues that the Court of Chancery erred because it should have recognized that Section 5.4 precluded any conduct by the buyer that it knew would have the effect of compromising the seller's ability to receive an earn-out. It also claims that the Court of Chancery erred when it held that the implied covenant must be read consistently with Section 5.4 because the specific standard in that contractual term reflected the parties'

---

[4] Bench Opinion at 63.
[5] *Id.* at 78.
[6] *Id.* at 79.

agreement about how the seller would be protected from post-closing conduct that could jeopardize an earn-out payment.

The seller's arguments are without merit. The Court of Chancery acted properly in giving Section 5.4 its plain meaning.[7] By its unambiguous terms, that term only limited the buyer from taking action intended to reduce or limit an earn-out payment. Intent is a well-understood concept that the Court of Chancery properly applied.[8] The seller seeks to avoid its own contractual bargain by claiming that Section 5.4 used a knowledge standard, preventing the buyer from taking actions simply because it knew those actions would reduce the likelihood that an earn-out would be due. As Section 5.4 is written, it only barred the buyer from taking action specifically motivated by a desire to avoid the earn-out.[9] Contrary to the seller's argument, the Court of Chancery never said

---

[7] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("When interpreting a contract, the role of a court is to effectuate the parties' intent. In doing so, we are constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended."); CORBIN ON CONTRACTS § 32.3 (2003) ("The plain, common, or normal meaning of language will be given to the words of a contract . . . .").

[8] "Intent" is most often defined and analyzed in the criminal law context. "[T]he modern [criminal law] approach is to define separately the mental states of knowledge and intent ([which is] sometimes referred to as purpose)." Wayne R. LaFave, 1 Subst. Crim. L. § 5.2 (2d ed. 2014). Most modern codes, including the Model Penal Code, "provide[] that one acts 'purposely' when 'it is his conscious object . . . to cause [] a result.'" *Id.* (quoting Model Penal Code § 2.02(2)(a)(i)); s*ee also United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 570 n.22 (1973) (noting that "the oldest rule of evidence" is "that a man is presumed to intend the natural and probable consequences of his acts") (Marshall, J., concurring); *Coverdale v. State*, 531 A.2d 1235 (Del. 1987) (Table) ("Intent is a design, resolve or determination with which persons act. Intent in the legal sense is purpose to use particular means to effect a certain result."); BLACK'S LAW DICTIONARY (10th ed. 2014) ("[I]ntent is the mental resolution or determination to do [an act].").

[9] *See Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) ("Delaware observes the well-established general principle that . . . it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement."); *Rhone-Poulenc*

3

that avoiding the earn-out had to the buyer's *sole* intent, but properly held that the buyer's action had to be motivated at least in part by that intention.[10]

Likewise, the seller's argument that it could rely on the implied covenant of good faith and fair dealing to avoid the burden to prove that the buyer intentionally violated Section 5.4 is without merit. Section 5.4 specifically addressed the requirements for an earn-out payment and left the buyer free to conduct its business post-closing in any way it chose so long as it did not act with the intent to reduce or limit the earn-out payment. And as the Court of Chancery found, "[the seller] attempted to negotiate for a range of additional affirmative post-closing obligations, but [the buyer] rejected all of them . . . . Instead of the various affirmative obligations, the agreement provided only that [the buyer] could not take action with the intent of reducing or undermining the earnout payment."[11] Accordingly, the Court of Chancery was very generous in assuming that the implied covenant of good faith and fair dealing operated at all as to decisions affecting

---

*Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195-96 (Del. 1992) ("Clear and unambiguous language in [a contract] should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it. [W]hen the language of a [contract] is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.") (internal citations and quotations omitted).

[10] Bench Opinion at 62-63.

[11] Bench Opinion at 79. The affirmative post-closing covenants that the seller sought but did not obtain at the bargaining table included obligations to "act in good faith to maintain existing or greater levels of business, to preserve relationships of customers . . . and cause the Surviving Corporation to have adequate amounts of capital required to achieve the Earn-Out Payments[,] make reasonable commercial efforts to recruit and employ sufficient employees to achieve the Earn-Out Payments[,] market and bid for new contracts consistent with past practice[,] and [] not divert any contracts or business opportunities from the Surviving Corporation to any other entity." App. to Opening Br. at 422 (Merger Agreement Redline Comparing Apr. 3 Draft with Apr. 11 Draft).

the earn-out, given the specificity of the merger agreement on that subject, and the negotiating history that showed that the seller had sought objective standards for limiting the buyer's conduct but lost at the bargaining table.[12] Therefore, the Court of Chancery correctly concluded that the implied covenant did not inhibit the buyer's conduct unless the buyer acted with the intent to deprive the seller of an earn-out payment.[13]

Finally, we reject the seller's argument that the Court of Chancery's factual determinations should not be given deference because they were set forth in a bench

---

[12] *See Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) ("The implied covenant of good faith and fair dealing involves a cautious enterprise, inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated. . . . When conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both.") (internal quotations omitted); *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636-37 (Del. Ch. 2011) ("[T]he implied covenant of good faith and fair dealing should not be applied to give plaintiffs contractual protections that they failed to secure for themselves at the bargaining table. . . . [T]he implied covenant is not a license to rewrite contractual language . . . . Rather, a party may only invoke the protections of the covenant when it is clear from the underlying contract that the contracting parties would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter.") (internal citations and quotations omitted), *aff'd*, 76 A.3d 808 (Del. 2013); *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004) ("When, as is the case here, the relevant contracts expressly grant the plaintiffs certain rights, . . . the court cannot read the contracts as also including an implied covenant to grant the plaintiff additional unspecified rights . . . . To do so would be to grant the plaintiffs, by judicial fiat, contractual protections that they failed to secure for themselves at the bargaining table."); *Katz v. Oak Indus.*, 508 A.2d 873, 880 (Del. Ch. 1986) ("[T]he appropriate legal test [for an implied contractual obligation] is [whether] it [is] clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter. If the answer to this question is yes, then . . . a court is justified in concluding that such act constitutes a breach of the implied covenant of good faith.").

[13] Because the seller cannot prevail even under the generous assumption the Court of Chancery used in assessing the seller's claim, we need not reach the buyer's well-reasoned argument that Section 5.4 addressed the full range of discretionary conduct relevant to the earn-out calculation, leaving no room for the implied covenant to operate at all.

ruling. That bench ruling dealt with the key factual contentions of the seller and did so clearly.[14] The ruling explained that the Court of Chancery was not persuaded that the buyer had acted with the requisite intent that would allow the seller to prevail on its breach of contract claim.[15]

The Court of Chancery is a busy court charged with giving parties answers to complicated questions in a range of cases, often on an expedited basis. One of the ways in which the judges of that court handle their demanding caseload is by issuing prompt bench decisions on the basis of settled law when they believe they can do so responsibly. That is what the Vice Chancellor did here, and his decision is well grounded in the facts of record and entitled to our deference.

For these reasons, we conclude that the seller's appeal is without merit and that the judgment of dismissal entered for the buyer should be AFFIRMED.

---

[14] Bench Opinion at 71-77.
[15] Bench Opinion at 77.