# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHAPTER 7 TRUSTEE CONSTANTINO FLORES on behalf of the Estates of Esio Beverage Company, LLC, Esio Holding, Company, LLC, and Esio Franchising, LLC, | : : : : : | |
| Plaintiff, | : : | |
| v. | : : | **C.A. No. 11141-VCS** |
| STRAUSS WATER LTD., | : : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Date Submitted:  June 22, 2016
Date Decided:  September 22, 2016

Kathleen M. Miller, Esquire of Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware, and Todd Kartchner, Esquire, Amy Abdo, Esquire, and Seth Schuknecht, Esquire of Fennemore Craig, P.C., Phoenix, Arizona, Attorneys for Plaintiff.

Philip A. Rovner, Esquire and Jonathan A. Choa, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, and Susan M. Freeman, Esquire and Justin J. Henderson, Esquire of Lewis Roca Rothgerber Christie LLP, Phoenix, Arizona, Attorneys for Defendant.

SLIGHTS, Vice Chancellor

Constantino Flores, Chapter 7 bankruptcy trustee for the estates of Esio Beverage Company, LLC, Esio Holding Company, LLC and Esio Franchising, LLC (collectively "Esio"), alleges in a Verified Amended Complaint ("Complaint") that Strauss Water Ltd. masterminded a fraudulent and otherwise tortious scheme to drive Esio into financial ruin so that it could seize as collateral to certain defaulted loan covenants Esio's valuable technology licenses, clients and business opportunities. It is alleged that Strauss accomplished this scheme by making a series of intentional misrepresentations that induced Esio to rely on Strauss as its sole source for the capital infusion it desperately needed, then declining to supply that capital infusion after Esio had reached a proverbial point of no return. Esio ultimately was forced to declare bankruptcy and its trustee thereafter filed this action to recover damages incurred due to Strauss's allegedly wrongful conduct.

Flores has brought claims on behalf of the Esio bankruptcy estate against Strauss[1] for (I) fraud, (II) fraudulent inducement, (III) negligent misrepresentation, (IV) breach of the implied covenant of good faith and fair dealing, (V) breach of oral promise, (VI) promissory estoppel and (VII) estoppel. Each of these claims generally relate to Strauss' alleged failure to follow through with its promises to

---

[1] For the sake of clarity and brevity, I will hereafter refer to claims brought by Flores on behalf of the Esio bankruptcy estate as Esio's claims.

infuse Esio with a $30 million equity investment. Esio also has alleged that Strauss tortiously interfered with certain of Esio's existing contracts (VIII) and prospective business relationships (IX) as part of its scheme to accelerate Esio's demise. Finally, Esio seeks to compel Strauss to arbitrate these claims (X) per contractual provisions, allegedly binding upon Strauss, that mandate arbitration. Strauss has moved to dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted under Court of Chancery Rule 12(b)(6).

After carefully reviewing the Complaint, I conclude that Esio has failed to state claims for fraud, fraudulent inducement, negligent misrepresentation, breach of the implied covenant of good faith and fair dealing, "breach of oral promise," promissory estoppel or estoppel, as all of these claims contradict the clear and unambiguous terms of the written contracts between the parties. Esio also has failed to state a claim for tortious interference with contract as all of the alleged "improper" acts undertaken by Strauss were expressly permitted by the parties' contracts and all of Strauss' alleged "improper" omissions involved matters where Strauss was under no duty to act.

Esio has, however, pled facts sufficient to allow a reasonably conceivable inference that Strauss tortiously interfered with Esio's prospective business relationship with a potential licensing partner. Defendant's alleged justifications for its actions with respect to this potential Esio business partner, while possibly

2

meritorious, are fact intensive and not appropriate for disposition on a motion to dismiss.

Finally, Esio's effort to compel arbitration fails as a matter of law. Strauss cannot be bound to an arbitration agreement to which it is not a party and, in any event, the claims Esio has brought here arise under a contract that contains an exclusive Delaware forum selection clause.

## I. BACKGROUND

In considering this motion to dismiss, I have drawn the facts from the "well-pled allegations of the complaint, . . . the documents incorporated into the complaint by reference, and . . . judicially noticed facts."[2]

### A. The Parties and Relevant Non-Parties

Esio filed for bankruptcy protection in 2013, and Flores was appointed the trustee of the bankruptcy estate. Esio had been in the beverage industry offering products that included water-based beverages and beverage dispensing machines. Its principal place of business was in Arizona.

Strauss is an Israeli limited company with its principal place of business in Tel Aviv. A portion of Strauss' business involves the sale of drinking water in the worldwide market. Non-party Rami Ronen was the Chief Executive Officer of Strauss.

_____

[2] *Desimone v. Barrows*, 924 A.2d 908, 928 (Del. Ch. 2007) (footnotes omitted).

3

## B. Esio Pursues an Infusion of Capital

In 2005, Esio entered into a development agreement and exclusive license with Intelligent Coffee Company, LLC ("ICC"), an Arizona limited liability company that, *inter alia*, developed products for the beverage industry. Under the license agreement, ICC gave Esio an exclusive license to ICC's beverage dispensing technology.

In 2011 Esio found itself strapped for cash and began to look for an infusion of capital in the range of $20 million–$30 million. It had developed products and technology, including the ICC licensed technology, and needed additional capital to promote the products and exploit its technology and intellectual property.

Esio approached Strauss in August, 2011 regarding a possible investment. Strauss expressed interest in partnering with Esio as a means to enter the United States market. It was also very interested in the beverage dispensing technology Esio had licensed from ICC. Esio, in turn, saw Strauss as an attractive partner both because it was well-resourced and because it had developed a specialized carbonation technology that Esio thought would fit well with its new products.

During this time, with full disclosure to Strauss, Esio actively explored other sources of capital. As of September, 2011, Esio had raised over $1 million that it was holding in escrow for a possible reverse merger and private placement.[3]

---

[3] The Complaint does not disclose the identity of Esio's potential merger partner.

Esio was clear that it was looking to Strauss to make an investment in Esio; it was not seeking and did not want debt financing. Strauss assured Esio that it "was not interested in being a bank that would simply lend Esio money."[4] Throughout the balance of 2011 Esio provided Strauss with extensive due diligence, including information about its existing and anticipated future customers, its marketing strategies, partners, suppliers, and client contacts. During this process Esio apprised Strauss of its contract with Walmart® that would enable Esio to place its products in more than two thousand Walmart® stores. Esio had planned to pay for the marketing of the Walmart® release with money invested by Strauss.

## C. The Parties Negotiate the Terms of their Relationship— The Oral Promises

During a meeting in Israel in November 2011, Esio advised Strauss that it was looking for an equity investment of $30 million. Strauss agreed. It proposed that it would initially extend a $5 million dollar "bridge loan" so that Esio would have access to cash quickly in order to satisfy its obligations to Walmart®.[5] Strauss committed that it would convert this initial loan into an equity investment when it completed the balance of its investment ($25 million). Ronen allegedly

---

[4] Verified Amended Complaint ("Compl.") ¶ 18.

[5] *Id.* ¶ 26.

represented that structuring the initial $5 million investment as a loan was a "formality [that allowed a] faster way to get Esio the money it needed" because Strauss board approval would not be required.[6] Esio agreed to the loan but only subject to the "express understanding that the loan would be converted to equity . . . and the second investment would follow."[7]

After Esio and Strauss orally agreed to the structure and amount of Strauss' investment, Strauss demanded that Esio put aside its plans to pursue a public offering and return the money it had raised in contemplation of "using a reverse merger to raise additional capital."[8] Strauss also caused Esio to create a holding company structure, alter its business plan, and reserve the equity ownership units that were to be issued to Strauss. Esio agreed to take these steps because Strauss had agreed to make a sizable investment and Esio was in dire need of capital.

In December 2011, Strauss required Esio to meet with Ofra Strauss, the Chairwoman of Strauss' parent company. Strauss representatives allegedly told Esio that if the deal was approved by Ofra, then the equity investment would be assured.[9] Less than forty-eight hours after Esio's meeting with Ofra, Strauss

---

[6] *Id.* ¶ 27.

[7] *Id.* ¶ 28.

[8] *Id.* ¶ 34.

[9] I refer to Ms. Strauss by first name to avoid confusion; no disrespect is intended.

informed Esio that Ofra had approved the entire deal. In April 2012, however, Esio learned from Ronen, allegedly for the first time, that the $25 million equity investment would require approval from both Strauss and its parent company—approvals Esio had believed were already in place.

Esio and Strauss executed a Term Sheet on January 18, 2012.[10] The Term Sheet outlined the terms of a "mutual licensing of IP."[11] It further provided for Strauss and Esio to enter into a convertible loan whereby Strauss would loan Esio $5 million that would be collateralized by Esio's intellectual property rights and Esio products. When discussing the loan, the Term Sheet laid out rights that Strauss would have "during the period until the Loan is either converted or repaid."[12] Strauss was to have the "option, to be exercised not later than December 31, 2013, to convert the Loan into shares of Esio."[13] If Esio had repaid any portion of the principal of the loan, then Strauss' option to convert the full amount of the loan would be subject to the revised balance of the loan.

Strauss also was to have the

> option . . . to make additional equity investment in Esio of an
> additional $25 million based on a pre-money valuation of $45 million,

---

[10] *Id.* ¶ 41.

[11] *Id.* Ex. 2.

[12] *Id.*

[13] *Id.*

> subject to Esio meeting certain performance targets . . . . If Esio does not meet the performance targets . . . Strauss Water will receive additional shares of equity, which shall serve the purpose of reducing the pre-money valuation.[14]

The Term Sheet provided that it, along with the license agreements and convertible loan agreement, would be governed by Delaware law. It also contained an exclusive New York forum selection clause.

Following the execution of the Term Sheet, Strauss required Esio to renegotiate its ICC License Agreement to allow Strauss access to the ICC technology. Esio alleges that it had "no choice but to agree" to renegotiate the ICC license because Strauss insisted that it have access to the ICC technology as a condition of its investment.[15] The amended license allowed Strauss a sub-license to ICC's technology and required Esio to make minimum quarterly payments to ICC which were greater than those required by the previous license (the "Amended ICC License.") Under the Amended ICC License, Strauss positioned itself to receive exclusive rights to ICC's technologies in North America should Esio default on the $5 million bridge loan. The Amended ICC License was further amended in May 2012 to give Esio an exclusive license for ICC's technology to be used in beverage dispensing systems (the "Second Amended ICC License"). The

---

[14] *Id.*

[15] *Id.* ¶ 48.

Second Amended ICC License is governed by Arizona law and provides for mandatory arbitration of disputes between the parties arising under the agreement to be conducted in Phoenix, Arizona.

After entering into the Second Amended ICC License with Esio, ICC signed a Side Letter Agreement with Strauss on May 10, 2012, whereby ICC consented to Strauss receiving both a lien and security interest in all of Esio's rights under the Second Amended ICC License. The Side Letter Agreement contains a forum selection clause designating New York as the exclusive forum for resolution of disputes arising under that agreement.

**D. The Parties Memorialize Their Agreement—The Papered Promises**

The loan closed on May 14, 2012. Prior to closing, Esio alleges that Strauss explained that even though the loan agreement would provide that conversion to equity was an option, "Strauss would automatically exercise the 'option' upon completion of its due diligence."[16] The loan agreement would also provide for what Esio characterizes as "an aggressive amortization schedule" which Strauss and Ronen knew Esio would not be able to meet without the additional promised $25 million capital infusion.[17] Through the end of May 2012, Strauss continued to represent that the conversion of the loan as well as the exercise of a warrant to

---

[16] *Id.* ¶ 55.

[17] *Id.* ¶ 53.

acquire the addition $25 million in equity would occur as soon Strauss' due diligence was completed.

### 1. The Loan Agreement

The Secured Convertible Loan Agreement between Strauss and Esio (the "Loan Agreement") was executed May 14, 2012, and provided for Strauss to lend Esio $5.25 million (the "Loan").[18] DLA Piper LLP served as counsel to Esio. Under the Loan Agreement and the attached Secured Convertible Promissory Note, Esio was to repay the outstanding principal amount as well as all other amounts by December 31, 2013. Esio also had the right to prepay the Loan.

> Regarding conversion, the Loan Agreement provided that:
>
> At any time following the Closing Date but before the Maturity Date, [Strauss] may, at its option, convert all, but not less than all, of its Note . . . into such number of duly authorized, validly issued, Class A Units equal to the amount . . . determined by dividing (a) the sum of the then outstanding principal and unpaid accrued interest on the Note and the Additional Convertible Amount by (b) the Conversion Price in effect at the time of such conversion.[19]

Section 9 of the Loan Agreement sets forth the parties' rights in events of default, which events include Esio's failure to repay the Loan according to schedule. Significantly, the Loan Agreement does not list Strauss's failure to convert the

---

[18] The parties agreed to add $250,000 to the initial $5 million Loan amount to pay for legal fees incurred in connection with the closing of the Loan.

[19] *Id.* Ex. 1.

Loan to equity as an event of default, nor does it prescribe any consequence should Strauss elect not to convert the Loan.

The Loan Agreement provides that the Loan Agreement and the rights and obligations of Esio and Strauss under it "SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE."[20] The Loan Agreement further provides that Delaware State courts or the United States District Court for the District of Delaware shall have "EXCLUSIVE JURISDICTION OVER THE PARTIES (AND THE SUBJECT MATTER) WITH RESPECT TO ANY DISPUTE OR CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS."[21]

### 2. The Warrant

Strauss and Esio also entered into a Warrant on May 14, 2012, whereby Strauss was "entitled at any time . . . to purchase from [Esio] up to 37,395.33 Class A Units."[22] Strauss was entitled in its discretion to execute the Warrant "in

---

[20] *Id.*

[21] *Id.* "Transaction documents" as defined within the Loan Agreement, include the Loan Agreement, the Note, the Warrant, Esio's Limited Liability Company Agreement, and the Security Agreements. *Id.*

[22] *Id.* Ex. 5.

whole or in part."[23]   The Warrant contains a merger clause,[24] as well as an expiration date and remedies for breach. It states that the Warrant is to be construed under Delaware laws but does not contain a forum selection clause.[25]

## E. The Parties' Relationship Breaks Down

By the end of May 2012, Strauss began telling Esio that it would need to conduct additional due diligence before it could convert the Loan.  This came as a surprise to Esio as it believed Strauss had already conducted exhaustive due diligence prior to entering the Loan Agreement.  The following month, during a meeting with key players of Esio and Walmart® involved in Esio's scheduled product launch at Walmart®, Strauss representatives were "disruptive and disrespectful" towards the Esio representatives and "denigrated the [Esio] business plan that Strauss had already explicitly approved."[26]  Strauss advised Esio that it might not make the $25 million equity investment even though Strauss knew Esio

---

[23] *Id.*

[24] Section 10.4 provides: "**Entire Agreement.**  This Warrant, together with the applicable provisions of the Operating Agreement, constitute the entire agreement between the parties with respect to the specific subject matter hereof.  Each provision hereof is severable for every other provision when determining legal enforceability.  The terms and conditions hereof will inure to the benefit of and be binding upon the parties' respective successors and assigns, except as expressly provided otherwise herein."  *Id.*

[25] *Id.*  Section 10.7 of the Loan Agreement, however, provides that the forum selection clause designating Delaware courts applies to all "transaction documents," which includes the Warrant.  *Id.* Ex. 1.

[26] *Id.* ¶ 67.

12

was counting on the investment and Esio was following the business plan that Strauss had directed and approved.

At some point after the Loan closed, Esio learned that Strauss' carbonation technology did not work. This rendered Strauss' promise of a strategic partnership illusory since Strauss' carbonation technology had been factored into Esio's business plan. To make matters worse, the launch of Esio products at Walmart® failed because Esio did not have the promised funds from Strauss to market the launch properly.

Esio also learned that Strauss had been meeting with Esio's customers without Esio's knowledge or permission. At a meeting with one such customer, PepsiCo, Strauss allegedly gave a demonstration of an Esio preproduction prototype of a carbonated beverage dispenser. The prototype malfunctioned. According to Esio, this episode "subverted Esio's chances of working with PepsiCo due to Strauss' use of a faulty product."[27]

In early 2013 Ronen began to make disparaging statements about Esio and its product to other Esio customers and licensors of Esio's technology, including ICC. He also announced to third parties and eventually to Esio that Strauss never intended to invest in Esio and had only provided the Loan in order to get Esio's technology. In February 2013, Ronen said that it would seize the Esio intellectual

---

[27] *Id.* ¶ 74.

property used to secure the Loan unless Esio was able to repay the Loan according to the agreed-upon schedule.

On February 13, 2013, Esio and Strauss met with Euro-Pro Operating, LLC, an appliance company interested in licensing manufacturing rights to Esio's beverage dispenser products. At the meeting, Esio hoped to discuss measures to reduce manufacturing costs, which would reduce Esio's need for a large capital infusion and help it stay viable. Ronen seized control of the meeting and advised Euro-Pro that Strauss controlled Esio's technology and the ICC License. Euro-Pro thereafter refused to deal with Esio.

During this same period, Ronen met with the Chief Executive Officer of ICC and the two discussed a potential business deal between Strauss and ICC that would exclude Esio and "secure Esio's demise."[28] Strauss sent Esio a formal notice of default under the Loan on February 17, 2013, and Esio's bankruptcy followed.

## II. PROCEDURAL STANDARD

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[29] Under this standard, Delaware courts will

---

[28] *Id.* ¶ 82.

[29] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[30]

The Court will not, however, "accept conclusory allegations unsupported by specific facts . . . or draw unreasonable inferences in favor of the non-moving party."[31]

## III. ANALYSIS

To address Strauss' motion to dismiss I have divided Esio's claims into three parts. First, I examine whether Esio has stated viable claims for fraud, fraudulent inducement, negligent misrepresentation, breach of the implied covenant of good faith and fair dealing, "breach of oral promise,"[32] promissory estoppel and estoppel. It is appropriate to group these claims together since the motion to dismiss challenges whether any of them are well-pled given that they rest on facts and alleged promises that contradict the clear terms of the parties' written contracts. Second, I examine the viability of Esio's claims for tortious interference with contract and tortious interference with prospective business relations. Finally,

---

[30] *Id.*

[31] *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011).

[32] I am unaware of any cause of action cognizable under Delaware law for "breach of oral promise." I will assume Esio intends to prosecute a claim for breach of an oral contract.

15

I consider Esio's claim that Strauss should be compelled to arbitrate these claims in Arizona.

## A. Esio's Claims That it Justifiably Relied Upon Extra-Contractual Promises and Representations and that Strauss Breached the Implied Covenant of Good Faith and Fair Dealing Are Belied by the Clear Terms of the Loan Agreement and Warrant

The disposition of Esio's fraud, estoppel, oral contract and implied covenant claims turns on a single factual fulcrum: the contracts between Esio and Strauss clearly set forth the parties' rights and obligations and patently contradict the claims Esio has attempted to plead in its Complaint. Under these circumstances, there can be no reasonable reliance and there can be no actionable extra-contractual covenants.

Delaware is a contractarian state.[33] As such, a party who enters into a contract governed by Delaware law will be charged with knowledge of the

---

[33] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at \*12 (Del. Ch. July 11, 2011) (noting that Delaware law "is more contractarian than that of many other states"). *See also Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) ("[W]e must . . . not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. *Parties have a right to enter into good and bad contracts, the law enforces both.*") (emphasis added); *Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005), *aff'd in pertinent part,* 892 A.2d 1068 (Del. 2006) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."); *Asten, Inc. v. Wangner Sys. Corp.*, 1999 WL 803965, at \*6 (Del. Ch. Sept. 23, 1999) ("Equity respects the freedom to contract. . . .").

16

contents of the instrument and will be deemed to have knowingly agreed to the plain terms of the instrument absent some well-pled reason to infer otherwise. And this same party will face an uphill climb when it seeks to prosecute claims that it relied on promises that are explicitly contradicted by its own clear and unambiguous written contract. These bedrocks of Delaware law apply in full force here.

**1. Esio Has Failed to State Claims for Fraud, Misrepresentation, Estoppel or Breach of Oral Contract**

The gravamen of Esio's Complaint is that Strauss made promises in advance of entering into the Loan Agreement and Warrant that it would convert the $5 million Loan into an equity investment and that it would invest an additional $25 million in Esio in short order after the Loan closed. Esio alleges that it relied on these promises when it agreed, *inter alia*, to commit its intellectual property to Strauss as security for the Loan and to amend its license with ICC. Now that it is clear Strauss never intended to invest in Esio, it is alleged that the pre-contract promises were either fraudulent or negligent misrepresentations and that Strauss should be estopped from denying its pre-contract commitments.

Claims for fraud, fraudulent inducement, negligent misrepresentation, promissory estoppel and estoppel all require a plaintiff to plead that he justifiably

17

or reasonably relied on the defendant's promise.[34] Esio has failed to plead facts upon which I can reasonably infer that it justifiably relied on Strauss' promises made prior to the execution of the parties' written contracts since the alleged promises are expressly contradicted by those same contracts. Indeed, "[i]t is

---

[34] "In order to state a claim for fraud or fraudulent inducement, plaintiff must plead with particularity the following elements: (1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) **the plaintiff's action or inaction taken in justifiable reliance upon the representation**; and (5) damage to the plaintiff as a result of such reliance." *Duffield Assocs., Inc. v. Meridian Architects & Eng'rs, LLC*, 2010 WL 2802409, at *4 (Del. Super. July 12, 2010) (emphasis added). To state a claim for negligent representation, a plaintiff must "plead that (1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) **the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information**." *Corporate Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *8 (Del. Ch. Apr. 10, 2008) (emphasis added). "Negligent representation is essentially a species of common law fraud with a lesser state of mind requirement." *Vichi v. Koninkklijke Philips Elec., NV.*, 85 A.3d 725, 762 (Del. Ch. 2014). To state a claim for promissory estoppel, "a plaintiff must show by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promise; (iii) **the promisee reasonably relied on the promise and took action to his detriment**; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *21 (Del. Ch. Sept. 30, 2014) (emphasis added) (internal quotation marks omitted). "To prevail on a claim of equitable estoppel, a plaintiff must show (1) conduct by the party to be stopped that amounts to a false representation, concealment of material facts, or that is calculated to convey an impression different from, and inconsistent with that which the party subsequently attempts to assert, (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth, (3) the intention or expectation that the conduct shall be acted upon by, or influence, the other party and **good faith reliance by the other**, and (4) action or forbearance by the other party amounting to a change of status to his detriment." *Olson v. Halvorsen*, 2009 WL 1317148, at *11 (Del. Ch. May 13, 2009), *aff'd*, 986 A.2d 1150 (Del. 2009) (emphasis added) (internal quotation marks omitted).

18

unreasonable to rely on oral representations when they are expressly contradicted by the parties' written agreement."[35] Given that the parties' written agreements are so clear, it is not surpising that Esio has not cited any authority that would support its argument that reliance upon contrary oral promises would be reasonable.[36]

As stated, the extra-contractual promises and representations that Strauss is alleged to have made are variations on a theme: that Strauss would invest in and cooperate with Esio as Esio's long-term business partner. Esio alleges that Strauss promised that it would share its technology with Esio, that it would work with Esio to implement Esio's long-term business plan and that it would provide Esio with $30 million in equity financing. These alleged promises are expressly contradicted by the several transactional documents that Strauss and Esio entered into—negotiated at arm's-length by sophisticated parties with the guidance of sophisticated counsel. Each of these contracts—the Term Sheet, Loan Agreement

---

[35] *Carrow v. Arnold*, 2006 WL 3289582, at *11 (Del. Ch. Oct. 31, 2006), *aff'd*, 933 A.2d 1249 (Del. 2007). While in *Carrow* the Court addressed a claim for fraudulent inducement, this principle also applies to the balance of Esio's misrepresentation and estoppel claims. *See MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *14 (Del. Ch. Dec. 30, 2010) (rejecting a fraud claim based on three oral statements that were expressly contradicted by a later contract); *Olson*, 2009 WL 1317148, at *12 ("Olson's [promissory and equitable] estoppel claims fail for the additional reasons that the alleged promises on which he bases his claims are inconsistent with the terms of the [contracts]").

[36] *See Carrow*, 2006 WL 3289582, at *11 (holding that one cannot claim fraudulent inducement "when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation" (quoting 17A Am.Jur.2d Contracts § 214 (2006)).

19

and Warrant—structures Strauss' "investment" as either debt with the option to be converted to equity or as an option to acquire equity.[37] Specifically, the documents clearly and unambiguously characterize Strauss' commitment as a loan with an **"option"** that Strauss **"may"** exercise to convert the Loan to an equity investment (the Loan Agreement) and as an **"option"** that Strauss **"may"** exercise to acquire additional Esio units (the Warrant).[38] The contracts do not even hint much less

---

[37] "[T]he parties shall enter into the Convertible Loan Agreement, pursuant to which Strauss Water shall provide a loan of $5 million to Esio." Compl. Ex. 2 (the "Term Sheet"). "During the period until the Loan is either converted or repaid [describing rights Strauss will be given]." *Id.* "Strauss Water will have the option, to be exercised not later than December 31, 2013, to convert the Loan into shares of Esio." *Id.* "The Lender agrees . . . to make a loan (the **"Loan"**) to the Borrower in an amount of up to five million two-hundred fifty thousand dollars." *Id.* Ex. 1 (the "Loan Agreement"). "The Borrower's obligation to pay the principal of, and interest on, the Loan shall be evidenced by a secured convertible promissory note . . . (the **"Note"**). *Id.* "[T]he Lender may, at its option, convert all, but not less than all, of its Note." *Id.* "Strauss Water shall have the option, to be exercised not later than March 31, 2013, to make an additional equity investment in Esio of an additional $25 million based on a pre-money valuation of $45 million, subject to Esio meeting certain performance targets as described below." *Id.* Term Sheet. "This Warrant certifies that, for value received, Strauss Water Ltd. . . . is entitled at any time . . . to purchase from Company up to 37,395.33 Class A Units (**"Warrant Units"**) at a price per Class A Unit equal to $668.53." *Id.* Ex. 5 (the "Warrant"). "Holder may exercise this Warrant, in whole or in part . . . at any time before the Expiration Date." *Id.*

[38] Esio has suggested in its papers and at oral argument that the term "option" may be ambiguous. Pl.'s Answering Br. in Opp'n to Def.'s Mot. to Dismiss Pl.'s Verified Am. Compl. ("Answering Br.") 16–18. To the extent Esio still intends to press that argument, I summarily reject it. I will not embrace a construction of the term "option" that suggests it might reasonably be read as "mandatory option." I am aware of no such creature in the realm of corporate finance or the broader realm of life. The terms "mandatory" and "option" present the classic binary opposition.

expressly reveal that the parties understood, as a matter of contract or otherwise, that Strauss was somehow obliged to invest in Esio.[39]

Esio's attempt to alter the construction of the Loan Agreement's and Warrant's otherwise unambiguous provisions regarding the terms of Strauss' Loan to Esio and its possible investment in Esio, respectively, cannot be countenanced for another reason that also is embedded in Delaware law. Delaware's "parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of the contract."[40] Thus, even if a provision is "mistakenly" left out of a document, "the parole evidence rule precludes the Court from considering the alleged oral promises made before the execution of [a written contract]."[41] The Court, instead, must be guided by what the parties say in their written contracts; it cannot be

---

[39] *See MicroStrategy Inc.*, 2010 WL 5550455, at *14 (granting motion to dismiss claim of reasonable reliance that was "contradicted by several express terms in the Agreement"); *Black Horse Capital, LP*, 2014 WL 5025926, at *21–22 (same).

[40] *Phillips v. Wilks, Lukoff & Bracegirdle, LLC*, 2014 WL 4930693, at * 3 (Del. Oct. 1, 2014), *as corrected* (Oct. 7, 2014) (citations omitted).

[41] *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *4 (Del. Super. Ct. Sept. 25, 2015) (further stating that while the agreement at issue "may not set forth everything in hindsight that TrueBlue intended to include, . . . that does not create an ambiguity").

21

distracted by misguided allegations of fraud or estoppel, however passionately they might be pled.[42]

Esio also misses the mark by arguing that the express terms of the contracts it negotiated and agreed to with Strauss cannot defeat its claim of justifiable reliance on prior oral promises because the Loan Agreement contains no integration clause and the integration clause within the Warrant is ineffective because it lacks an anti-reliance clause.[43]  Strauss' arguments that Esio has failed to plead facts that would justify departing from the express terms of the parties' written agreements do not rest on the presence, or not, of integration or anti-reliance clauses.  Instead, Strauss correctly argues that Esio cannot proffer alleged oral promises or representations to alter or contradict unambiguous provisions clearly expressed within the parties' written contracts.  Yet that is precisely what Esio seeks to do here with respect to its fraud, negligent misrepresentation,[44] estoppel and oral contract claims.

---

[42] *Black Horse Capital, LP*, 2014 WL 5025926, at *24 ("By attempting to plead around the plain language of their written agreements with allegations of 'fraud,' Plaintiffs seek to shirk the bargain evidenced by the written agreement in favor of a 'but we did rely on those other representations" claim).

[43] Answering Br. 22–24.

[44] The negligent misrepresentation claim also fails because it is barred by the economic loss doctrine, which allows a party to recover in negligence only "if losses are accompanied by bodily harm or property damages."  *J.C. Trading Ltd. v. Wal-Mart Stores, Inc.*, 947 F.Supp. 2d 449, 459 (D. Del. 2013) (internal quotation marks omitted).  It does not permit recovery "for losses that are solely economic in nature."  *Id.* (internal

Even where certain of the alleged oral promises are not expressly contradicted by the written contracts, such as Esio's contention that Strauss promised it would share its working carbonation technology when, in fact, it did not work, Esio still has failed to plead facts that allow a reasonable inference of justifiable reliance as a matter of law. The Term Sheet provided that Strauss and Esio would enter into an agreement regarding Esio's use of Strauss' carbonation technology, and the subsequent License and Distribution Agreement between Esio and Strauss expressly addresses the parties' rights to cross license.[45] Yet Esio pleads neither that Strauss breached that agreement nor that Strauss somehow prevented Esio from exercising its bargained-for right under that agreement to conduct due diligence with respect to Strauss' carbonation technology.[46] Once again, Esio seeks to avoid the deal it made in favor of the deal it now wishes it

quotation marks omitted). Here, Esio is claiming only economic damages and does not allege damage to its intellectual property or to Esio's rights as a licensee to ICC's intellectual property. While Esio alleges that it lost its technology and licensing rights, Compl. ¶ 121, it does not allege that there was any damage to the technology or its rights as a licensee, except that it was unable to pay the Loan and therefore defaulted under the Second Amended ICC License.

[45] Transmittal Aff. of Phillip A. Rovner, Esq. in Supp. of Strauss Water, Ltd.'s Mot. to Dismiss ("Transmittal Aff.") Ex. 8. The Court may consider this agreement as it is integral to the Plaintiff's Complaint. *See* Compl. ¶¶ 73, 85(viii). *See also Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013).

[46] Transmittal Aff. Ex. 8 § 6.4.1(a). *See Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 551 n.305 (Del. Super. Ct.) ("Delaware courts do not rescue disappointed buyers from circumstances that could have been guarded against through normal due diligence and [the exercise of] contractual protections"), *aff'd*, 886 A.2d 1278 (Del. 2005) (TABLE).

23

made. Delaware law does not permit Esio or the Court to rewrite history when that history is expressed in clear and unambiguous written contracts.

Esio's fraud, misrepresentation and estoppel claims require well-pled facts to support a reasonably conceivable inference that Esio justifiably relied upon Strauss' extra-contractual promises or representations. Esio's written contracts with Strauss allow no such inference. Nor can the Court enforce alleged oral promises that directly contradict commitments made in subsequent written contracts. Strauss' motion to dismiss these claims must be granted.

## 2. Esio Has Failed to State a Claim for Breach of the Implied Covenant

Esio alleges that even though Strauss may have complied with written contracts that directly address the terms of Strauss' Loan and possible equity investment, Esio may still hold Strauss liable for breaching the implied covenant of good faith and fair dealing. I disagree. The implied duty of good faith and fair dealing applies only when "it is clear from the underlying contract that the contracting parties would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter."[47] It follows, then, that the implied covenant of good faith and fair dealing does not apply when the contract speaks directly to the alleged gap in the contract the implied covenant has

---

[47] *Winshall v. Viacom Intern., Inc.*, 55 A.3d 629, 637 (Del. Ch. 2011) (internal quotation marks omitted).

been proffered to fill.[48]  Esio's claim for breach of the implied covenant of good faith and fair dealing fails since the contracts speak directly to the contested issue—that the Loan may but need not be converted to equity and that any future investments are optional, not mandatory.

## B. Tortious Interference

As is typical of Esio's complaint, many of its allegations regarding tortious interference attempt to reach outside the four corners of its contracts with Strauss and impose upon Strauss additional obligations or alternatively limit Strauss' bargained-for rights.  As discussed below, Esio's claim for tortious interference with contract is not well-pled because Esio again seeks to vary the terms of its written contracts with Strauss in order to state an extra-contractual claim. However, a single subset of its claim for tortious interference with prospective business relations (that does not attempt to alter the parties' contracts) does survive as Esio has well-pled that Strauss interfered with Esio's prospective business relationship with Euro-Pro.

---

[48] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009) ("The implied covenant does not apply when the subject at issue is expressly covered by the contract" and "[c]ourts should be most chary about implying a contractual protection when the contract easily could have been drafted to expressly provide for it." (internal quotation marks omitted)).

**1. Esio has Failed to State a Claim for Tortious Interference with Contract**

Esio alleges that Strauss tortiously interfered with the Second Amended ICC License by (a) forcing Esio to renegotiate the ICC License and then putting Esio in a financial position where it was unable to make its payments to ICC and (b) colluding with ICC in a manner that caused ICC to breach the implied covenant of good faith and fair dealing by refusing to modify the ICC license.[49] Because Strauss acted within its contractual rights, Esio's allegations of tortious interference fail to state a claim.

The typical claim for tortious interference arises when the defendant wrongfully prevents a third party from performing a contract. This cause of action follows the Restatement (Second) of Torts, § 766, and requires "(1) a valid contract, (2) about which the defendants have knowledge, (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract, (4) without justification and (5) which causes injury."[50]

---

[49] Esio's only claim for tortious interference with contract relates to the Second Amended ICC License. While Esio also alleges that Strauss tortiously interfered with its relationship with Walmart®, it classifies this claim as tortious interference with prospective business relations and does not allege that Strauss caused Walmart® to breach an existing contract. Compl. ¶¶ 160, 165–66, 150–57.

[50] *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987) (citing RESTATEMENT (SECOND) OF TORTS § 766 (1979)).

Section 766A of the Restatement (Second) of Torts extends the cause of action to instances where the defendant is alleged to have tortiously interfered with the *plaintiff's* performance of a contract, providing that "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him."[51] The cause of action outlined in Section 766A is less widely adopted,[52] and has never formally been recognized by Delaware courts.[53]

As discussed below, whether the claim is brought under Section 766 or Section 766A, a plaintiff cannot prevail on a tortious interference with contract claim if the essence of his complaint is that the defendant refused to deal when he had no obligation to deal,[54] or that the defendant's alleged tortious conduct

---

[51] RESTATEMENT (SECOND) OF TORTS § 766A (1979).

[52] *See, e.g.*, *Price v. Sorrell*, 784 P.2d 614 (Wyo. 1989) (rejecting Section 766A as a viable cause of action due largely to the potential for abuse and citing cases in accord).

[53] Esio cites *Allen Family Foods, Inc. v. Capitol Carbonic Corp.*, 2011 WL 1205138 (Del. Super. Ct. 2011), for the proposition that Delaware has formally adopted Section 766A as a cause of action. This reads too much into the *Allen* court's treatment of Section 766A. *Allen* merely determined that "Delaware would not reject Section 766A" on the bases proffered by the defendant there before going on to hold that the plaintiff had not stated a viable claim under Section 766A in any event. *Id*. at *6. The same holds true here; Esio has failed to plead a claim under Section 766A.

[54] RESTATEMENT (SECOND) OF TORTS § 766 cmt. b (1979).

amounted to nothing more than the defendant acting within its contractual rights.[55]

Both of Esio's theories of tortious interference with contract, as pled, rest on these unactionable premises.

### a. Esio Has Not Stated a Claim Under Section 766A.

I have already determined that the contracts between Esio and Strauss merely provided Strauss with the option to convert the Loan to equity and to make further equity investments. Therefore, Strauss's decisions to enforce its Loan covenants with Esio when Esio defaulted on the Loan, including its seizure of the pledged collateral, and not to invest further in Esio cannot constitute tortious interference with Esio's performance of the Second Amended ICC License or any other contract since Strauss' refusal to deal was justified. Since Esio has failed to plead that Strauss' conduct was tortious, I need not decide whether *vel non* Section 766A should be adopted as Delaware law.

---

[55] *See, e.g.*, *Debakey Corp. v. Raytheon Service Co.*, 2000 WL 1273317, at *18 (Del. Ch. Aug. 25, 2000) (refusing to find a party liable for breaching its implied covenant of good faith and fair dealing when it failed to make a further investment where the contract provided that once investments had exceeded $2 million, further investments were subject to the party's "sole discretion"). *See also Crivelli v. General Motors Corp.*, 215 F.3d 386, 395 (3d Cir. 2000) (applying Pennsylvania law and noting that many courts have "held that a company's exercise of a right of first refusal [granted to them in contract] cannot ordinarily give rise to a claim of intentional interference with a contract").

### b. Esio Cannot Claim that Strauss Tortiously Caused ICC to Breach the Implied Covenant of Good Faith and Fair Dealing

A party cannot claim a tortious interference with contract when there has been no breach of that contract.[56] To get around this fundamental premise, Esio seeks once again to invoke the implied covenant of good faith and fair dealing to achieve what its express contracts (in this instance, the Second Amended ICC License) will not support—a basis to impose liability upon Strauss for ICC's refusal to modify the Second Amended ICC License so that Esio could continue to exploit it. The implied covenant will not impose on ICC an obligation that Esio did not bargain for in the Second Amended ICC License.

While it is true that the implied covenant of good faith and fair dealing inheres to every Delaware contract, it cannot be employed to rewrite an otherwise comprehensive written contract between the parties.[57] Rather, the implied covenant requires parties to a contract only to "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[58] The court will not impose the

---

[56] *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 713 (Del. Ch.), *aff'd*, 861 A.2d 1251 (Del. 2004).

[57] *Nemec v. Shrader*, 991 A.2d 1120, 1125–26 (Del. 2010).

[58] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation marks omitted).

implied duty of good faith and fair dealing on a party to require that the party actually improve the deal the plaintiff struck in the first instance.[59]

Once again, Esio would have the Court ignore the contract it negotiated with ICC by injecting it with provisions that would require ICC to modify the license in the event Esio committed an act of default under either the Second Amended ICC License or the Loan Agreement. This Court will not engage in that kind of "judicially compelled charity."[60] Esio could have negotiated for a provision that expanded its rights to compel a modification of the Second Amended ICC License in certain instances of default. It did not. Therefore, because ICC was not required to modify the Second Amended ICC License, Strauss cannot be held liable for tortiously interfering with the Second Amended ICC License by causing ICC to breach the implied covenant when it refused to modify that contract.

### 2. Esio Has Stated a Claim for Tortious Interference with Prospective Business Relations

To plead a claim for tortious interference with prospective business relations, Esio was required to allege facts that demonstrate "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant

---

[59] *Winshall*, 55 A.3d at 641 (holding that Delaware law does not interpret the implied covenant to a require that the defendant "not simply refrain from upsetting the fundamental expectations of the other party, as implied by the explicit terms of the deal, but actually improve that deal by expanding its contractual counterparty's expectancy as a matter of judicially compelled charity.").

[60] *Id.*

with that opportunity, (c) proximate causation and (d) damages."[61] In addition, Esio was required to plead that Strauss' alleged interference was somehow improper.[62] As discussed above, there can be no improper interference where the defendant acted either (1) affirmatively within its contractual rights or (2) by omission where it had no contractual obligation to deal. Thus, having determined that Strauss was within its contractual rights to enforce its Loan covenants and decline to invest in Esio, any claim that Strauss tortiously interfered with Esio's prospective business relations with Walmart® or any other retailer or supplier by failing to infuse Esio with more capital is not well-pled.[63]

What remains of Esio's tortious interference with prospective business relations claim are Esio's allegations that Strauss: (1) intentionally sabotaged the Euro-Pro meeting and thereby interfered with Esio's prospects of developing a business relationship with Euro-Pro, and (2) improperly met with PepsiCo without Esio's knowledge or permission and thwarted any possible business relationship

---

[61] *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981). *See also* RESTATEMENT (SECOND) OF TORTS § 766B (1979).

[62] *See Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1287 (Del. Super. Ct. 2001) ("Plaintiffs bear the burden of proof with respect to all elements of the claim of intentional interference, including that the interference was improper").

[63] Compl. ¶¶ 160, 163, 165–66.

with PepsiCo by claiming the Esio's products belonged to Strauss and demonstrating a faulty product prototype.[64]

While the plaintiff must ultimately prove the reasonable probability of a business opportunity, the "existence of such a business expectancy is a question of fact not suitable for resolution [on a motion to dismiss]."[65] Esio has pled prospective business opportunities with Euro-Pro and PepsiCo and those well-pled facts are presumed to be true at this stage of the proceedings.

Esio has also pled that Strauss engaged in conduct with respect to PepsiCo and Euro-Pro that interfered with Esio's prospects of developing business relationships with these two fixtures of the beverage industry. Strauss counters that any conduct in which it might have engaged at meetings with PepsiCo and Euro-Pro was justified under Sections 769[66] and 773[67] of the Restatement (Second)

---

[64] Compl. ¶¶ 74, 161, 163(vi).

[65] *Gill v. Del. Park, LLC*, 294 F.Supp. 2d 638, 646 (D. Del. 2003).

[66] "One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he (a) does not employ wrongful means and (b) acts to protect his interest from being prejudiced by the relation." RESTATEMENT (SECOND) OF TORTS § 769 (1979).

[67] "One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." RESTATEMENT (SECOND) OF TORTS § 773 (1979).

of Torts because it was protecting its legally protected or financial interests.[68] Strauss points to no particular provision in any of its contracts with Esio that would authorize Strauss to represent to potential business partners that Esio's products and technology actually belonged to Strauss or would permit Strauss to make disparaging comments about the efficacy or quality of Esio's technology or product line.[69] Instead, Strauss argues generally that it took steps it believed were necessary under the circumstances to protect its Loan collateral.[70] While this may ultimately prove true, justification defenses under Sections 769 and 773 present fact-intensive inquiries that are typically not appropriate for disposition on a motion to dismiss.[71]

---

[68] The "burden of showing privilege rests upon the [alleged] interferor. . . ." *Bowl-Mor Co., Inc. v. Brunswick Corp.*, 297 A.2d 61, 66 (Del. Ch. 1972) (addressing a defense raised under Section 769). *See also Matter of L.B. Trucking, Inc.*, 163 B.R. 709, 725 (Bankr. D. Del. 1994) (in discussing Section 773 the court stated that "[i]f these circumstances exist, the defendant has a meritorious defense to the alleged tort of intentional interference with the performance of a contract by a third person.").

[69] These allegations must be accepted as true at this stage of the proceedings.

[70] Def. Strauss Water Ltd.'s Opening Br. in Supp. of its Mot. to Dismiss the Am. Compl. 44–48.

[71] For instance, according to the Complaint, the meetings with PepsiCo and Euro-Pro where Strauss is alleged to have engaged in tortious interference occurred prior to Strauss declaring a default of the Loan. Compl. ¶¶ 74–81 (Strauss meets with customers after the Loan closed through early February, 2013); *Id.* ¶ 83 (Strauss sends notice of default on February 17, 2013). The extent to which Strauss was justified in taking actions with respect to PepsiCo and Euro-Pro to protect its collateral prior to declaring a default of the Loan is, at least in part, a question of fact. Section 769 requires Strauss to demonstrate it did "not employ wrongful means;" Section 773 requires Strauss to demonstrate that it

33

Esio also must plead that Strauss' alleged tortious interference was the proximate cause of its damages. Delaware embraces a "but for" causation paradigm where proximate cause exists when an act or omission "in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred."[72]

Esio alleges that Strauss' statements to PepsiCo representatives that Strauss, not Esio, controlled Esio's products and technology, and its demonstration to PepsiCo of a faulty prototype, tortiously interfered with any prospect that Esio might form a business relationship with PepsiCo.[73] What Esio has failed to plead, however, is that a business relationship with PepsiCo might have saved Esio from the harm it alleges to have suffered as a proximate result of the wrong. The Complaint contains no allegations of what a business relationship with PepsiCo might have brought to Esio or how it might have saved Esio from its financial demise. In the absence of such allegations, it is not reasonably conceivable that

---

acted in "good faith" using "appropriate means." RESTATEMENT (SECOND) OF TORTS §§ 669, 773 (1979). These are fact-intensive inquiries that must be undertaken with the benefit of a factual record. *See Bowl-Mor Co. Inc.*, 297 A.2d at 66 (holding that justification defense could not be determined "as a matter of law").

[72] *Duphily v. Del. Elec. Co-op., Inc.*, 662 A.2d 821, 828–29 (Del. 1995) (internal quotation marks and alterations omitted).

[73] Compl. ¶¶ 74, 161, 163(vi).

Strauss' alleged tortious interference with Esio's prospective business relationship with PepsiCo was a proximate cause of Esio's alleged harm.[74]

Esio's allegations with respect to the lost business opportunity with Euro-Pro are more substantive. As noted, Esio alleges that Strauss hijacked its meeting with Euro-Pro and told Euro-Pro that it would have to deal with Strauss because Strauss now controlled Esio's technology.[75] The purpose of this meeting, at least from Esio's perspective, was to enlist Euro-Pro as a partner who might offer "measures that would help Esio reduce manufacturing costs to remain financially viable and reduce the need for a larger financial investment."[76] The allegations are thin but do present a reasonably conceivable basis upon which Esio might demonstrate that a business relationship with Euro-Pro, had Strauss not interfered with it, would have lowered Esio's manufacturing costs in a manner that would have allowed it to service its debt with Strauss and remain viable. Therefore, Esio has adequately pled that Strauss' actions during the Euro-Pro meeting were a proximate cause of its damages.

---

[74] *See Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001) (affirming dismissal of tortious interference claim on motion to dismiss because it was not reasonably conceivable based on the complaint that the alleged interference proximately caused the harm alleged).

[75] Compl. ¶¶ 80–81, 163(ii).

[76] *Id.* ¶ 79.

35

## C. Esio Has Pled No Basis to Compel Arbitration

Esio seeks a declaration that Strauss must arbitrate the claims Esio has brought in this Court because they are connected to claims that are the subject of arbitration proceedings pending between Esio and ICC in Arizona. Once again, Esio would have the Court vary the terms of its contracts with Strauss to compel a result for which it did not bargain.

Esio and Strauss disagree about whether Arizona or Delaware law governs the determination of whether the arbitration clause in the Second Amended ICC Agreement is binding upon Strauss. When determining which sovereign's laws to apply when laws potentially conflict, Delaware courts use a two-part test:

> [F]irst, the court determines whether there is an actual conflict of law between the proposed jurisdictions. If there is a conflict, the court determines which jurisdiction has the 'most significant relationship to the occurrence and the parties' based on the factors (termed "contacts") listed in the Restatement (Second) of Conflict of Laws.[77]

Where the result would be the same under both sovereign's laws, there is a "false conflict" and "the Court should avoid the choice-of-law analysis altogether."[78] Here, both parties agree in their briefs that the there is no real conflict between

---

[77] *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1050 (Del. 2015).

[78] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010).

Delaware and Arizona with regard to the arbitration issue.[79] I will apply Delaware law.

It is "well settled law in Delaware that choice of forum provisions are enforceable."[80] The Loan Agreement contains a Delaware forum selection provision that governs both that contract and the Warrant. Absent some compelling reason to disregard this provision, it should be enforced. The Side Letter that Strauss entered into with ICC, which incorporates the Second Amended ICC License, contains its own forum selection clause selecting New York State courts or federal courts that sit in the Borough of Manhattan. None of these agreements to which Strauss is a party require Strauss to submit to arbitration with Esio.

As a general rule, this Court will compel parties to submit to arbitration only where they have agreed to arbitrate as a matter of contract.[81] A non-signatory will be bound by an arbitration clause within a contract only if "traditional principles of contract and agency law equitably confer upon that party signatory status with

---

[79] *See* Answering Br. 51, n.13 ("Even if Delaware law applied to this analysis, the result would be the same"); Def. Strauss Water Ltd.'s Reply Br. in Further Supp. of its Mot. to Dismiss the Compl. 32 ("The result is the same, however, even if Arizona law applies").

[80] *Flintkote Co. v. Aviva PLC*, 769 F.3d 215 (3d Cir. 2014) (applying Delaware law).

[81] *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78–79 (Del. 2006).

regard to the underlying agreement."[82]    A non-signatory may be found to have "embraced" a contract "(1) where the non-signatory direct[ly], rather than indirect[ly] benefit[ted] from the [agreement] during the course of the agreement's performance[,]; (2) where the non-signatory consistently maintain[s] that other provisions of the same contract should be enforced to benefit him[,]; or (3) where the non-signatory sue[s] to enforce the provisions of a contract that it likes, while simultaneously disclaiming the provisions that it does not."[83]

Under the third-party beneficiary theory, the third-party must directly benefit from the agreement.  While Esio renegotiated with ICC to allow Strauss access to the ICC technology, Strauss' rights to this technology did not flow directly from the Second Amended ICC License.  Rather, Strauss' benefit from the Second Amended ICC License was indirect and was dependent upon the Side Letter where ICC approved Strauss' security interest in Esio's license to ICC technology, the pledge of the Second Amended ICC License as collateral for the Loan and the cross-licensing agreement between Strauss and Esio.  Since Strauss did not directly benefit from the Second Amended ICC License, the third-party beneficiary theory cannot be used to compel Strauss to join the Arizona arbitration.[84]

---

[82]*NAMA Hldgs., LLC v. Related World Mkt. Ctr.*, 922 A.2d 417, 430 (Del. Ch. 2007).

[83] *Flintkote*, 769 F.3d at 221 (alteration in original) (internal quotation marks omitted).

[84] I note that the third-party beneficiary theory is typically cited as a basis to bind a non-signatory to arbitration when the non-signatory seeks to prosecute claims outside of

The doctrine of equitable estoppel may also bind a party to an arbitration agreement even where it is a non-signatory if the non-signatory "by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to its detriment."[85] The party who claims that another is bound to an arbitration clause by estoppel must demonstrate that "(i) [it] lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) [it] reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) [it] suffered a prejudicial change of position as a result of their reliance."[86] The estoppel theory breaks down when the party seeking to compel arbitration is a party to another agreement with the party whom it seeks to compel to arbitrate, that other agreement is central to the dispute and it contains an express forum selection provision.[87] Under these circumstances, the moving party will be precluded from claiming that it reasonably expected it would be able to compel arbitration notwithstanding the contrary forum selection provision to which it agreed.[88]

---

arbitration. Esio has failed to cite any cases where this theory has been applied by a court to bind a non-signatory defendant to arbitrate claims brought against it.

[85] *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903–04 (Del. 1965).

[86] *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch.), *aff'd*, 884 A.2d 512 (Del. 2005).

[87] *Flintkote*, 769 F.3d at 223.

[88] *See id.* (finding that the defendant was not required to arbitrate where it was party to an agreement with the plaintiff that contained an express forum selection provision).

Here, Strauss expressly maintained its right to litigate claims arising under the Loan Agreement, Warrant and Side Letter in the fora agreed to by the parties to those contracts. Therefore, Esio cannot be heard to argue that Strauss is estopped from refusing to submit to arbitration under the Second Amended ICC License or that it should be compelled to do so.

## IV.   CONCLUSION

For the foregoing reasons, the Complaint fails to state a claim upon which relief can be granted under Court of Chancery Rule 12(b)(6). Defendants' motion to dismiss is GRANTED as to Counts I, II, III, IV, V, VI, VII, VIII and X with prejudice, and DENIED as to Count IX (only with respect to the alleged tortious interference with Esio's prospective business relations with Euro-Pro).

**IT IS SO ORDERED.**